UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MICHAEL ROBINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No.: 2-20-cv-63 |
| | ) | |
| v. | ) | |
| | ) | |
| USW LOCAL 1066 and UNITED STATES | ) | |
| STEEL CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

This matter is before the court on the Motions for Summary Judgment [DE 70; DE 74] filed by the defendants, United States Steel Corporation (USS) and United Steelworkers Local 1066 (USW). Plaintiff filed Responses [DE 81; DE 90]. Defendants filed Replies [DE 92; DE 101]. This matter is ripe for ruling.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c). This case was originally before Magistrate Judge Joshua P. Kolar prior to his appointment to the Seventh Circuit United States Court of Appeals. Due to the transfer of this matter amongst many others, the court now enters this Opinion and Order noting the importance of judicial efficiency. The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment. [DE 42]. On February 1, 2024, this case was reassigned from Magistrate Judge Joshua P. Kolar to Magistrate Judge Andrew P. Rodovich, and the parties did not object. [DE 47]. Magistrate Judge Andrew P.

Rodovich has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; N.D. Ind. L.R. 72-1.

## I. *Background*

Plaintiff Michael Robins initiated this lawsuit against his former employer, United States Steel Corporation (USS), and his local union, United Steelworkers Local 1066 (USW), alleging discrimination and retaliation on the basis of race pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. In Counts I–III, Robins alleges that USW discriminated and retaliated against him in their representation of him, in violation of Title VII and 42 U.S.C. § 1981. [DE 43 at 4–6].  In Counts IV–VI, Robins alleges that USS discriminated against and retaliated against him because of race when he was suspended, placed on a Last Chance Agreement (LCA), and later terminated for violating the LCA by making a false statement regarding a call-off. *Id.* at 6–9. Robins alleges that both defendants discriminated against him because he is African American. [DE 43].

USS hired Robins as a Maintenance Technician Electrical Learner and employed Robins from March 12, 2018 to July 22, 2019. [DE 82 at 2]. USW represented Robins. *Id.* Robins started out as a "probationary employee," a designation that lasted for the first 1040 hours of employment. *Id.* USS has workplace policies that prohibit harassment, discrimination, and retaliation, while also subjecting employees to discipline if they make false reports of such incidents. *Id*.

During his employment at USS, Robins worked in three different positions. He was first assigned to work at USS's Gary Works "Pickle" Department. *Id.* at 3. A more senior USS employee, David DeBoer, believed he was entitled to a position in the Pickle Department and filed a grievance. *Id.* Robins was transferred to the Crane Repair Department on July 30, 2018, as

part of the resolution between USS and USW over DeBoer's grievance. *Id.* Robins objected to the transfer and argued that a co-worker with less seniority should have been transferred instead. *Id.* USW filed a grievance on Robins's behalf, challenging his assignment to Crane Repair. *Id.* at 4. Robins also filed a charge with the National Labor Relations Board (NLRB), which later was withdrawn, and contacted the U.S. Equal Employment Opportunity Commission (EEOC) but did not pursue a charge. [DE 91 at 5–6].

Instead, the grievance was resolved on January 8, 2019, and Robins was transferred back to a Pickle assignment. This assignment was in the hot rolling division at the Gary Works Coiler Department. [DE 82 at 4; DE 91 at 5]. Robins worked at the Coilers Department from January 15, 2019, until the end of his employment with USS on July 22, 2019. [DE 82 at 4]. It was during his position at the Coiler Department that the issues relating to this litigation occurred.

Robins's relationship with his co-workers at the Coiler Department quickly became problematic. Robins's co-workers complained to USS and USW that Robins was "combative" and "fished for fights." *Id.* Robins subsequently informed USS Labor Relations Representative Sam Downs that he was subjected to "covert racism." *Id.* at 5. Robins pointed to an incident where his co-worker, Lee Christmas, was playing audio from a podcast discussing black-on-black crime in a manner Robins found "offensive by nature." [DE 81 at 5]. Downs met separately with Robins and with his coworkers and instructed them to learn to work together. [DE 82 at 5–6; DE 81 at 6]. On a separate occasion, union representative, Robert Popplewell, also met with the crew. [DE 75 at 5].

*A: Parking Lot Incident*

The first alleged adverse employment action stemmed from an incident that occurred on April 1, 2019. The exact events of that day are disputed, so the court lays out the undisputed facts

and draws any reasonable inferences in the light most favorable to Robins. *Johnson v. Accenture LLP*, 142 F.4th 536, 542 (7th Cir. 2025) ("[t]urning to the merits, we review a summary judgment decision de novo and construe the record in the light most favorable to the nonmoving party.") (citing *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 891 (7th Cir. 2024)).

After Robins's April 1st shift, he called plant security and claimed that Christmas drove up to him and yelled obscenities. [DE 82 at 5]. Robins informed security that it was not an emergency, but they dispatched a guard to speak to Robins at the scene. *Id.* Two reports were generated following the incident: one by the security guard who responded to Robins's call and another by the USS Ethics Hotline which Robins contacted later that day. According to the security guard's account, Robins informed him that Christmas exited his vehicle twice. The first time was before parking to shout "F*** you" and "I'll kick your black a**" at Robins, and then again after parking. According to the report generated by the Ethics Hotline, Christmas remained in his vehicle and shouted "F*** your black a**" before parking and then exiting his vehicle. *Id.* at 5–6. Robins and Christmas were both kept off USS property while the incident was investigated. [DE 91 at 8–9].

In the following days, Downs investigated the incident, interviewed Robins and Christmas, and spoke with the security guard who made the report. Downs purportedly found Robins's accounts to be inconsistent in two regards: first, as to whether Christmas exited his car during the interaction and after parking, or only after parking, and second, as to whether Christmas made physical threats ("I'll kick your black a**") or racially-disparaging remarks that did not threaten physical harm ("F*** your black a**"). Citing these inconsistencies in the two reports, Downs determined that Robins had provided inconsistent information and suspended Robins for five days. [DE 82 at 7–9].

The parties do not dispute that the reports contained differing accounts of the actual events on April 1, 2019. Robins does, however, maintain two points: 1) the security guard incorrectly wrote down his statements and that he did not claim Christmas exited his vehicle twice; 2) Robins denies that it was inconsistent to claim that Christmas made threatening statements because he maintains that he found the situation to be threatening. [DE 82 at 6].

USS informed Popplewell, USW's grievance chair, that it was going to take some further action against Robins. [DE 91 at 10]. This led to the LCA negotiation between USS and USW. [DE 82 at 9]. Robins inconsistently disputes whether USS had intended to terminate him, [DE 91 at 10], while at other points admitting that Popplewell informed him that he would be discharged if did not sign the LCA, [DE 82 at 9]. Regardless, Robins agrees that the LCA made other disciplinary options irrelevant. [DE 91 at 10]. Popplewell informed Robins of the LCA terms, explained that he did not have to sign it, and provided Robins's options if he chose to contest the discharge. Robins decided to sign the LCA. [DE 82 at 9; DE 91 at 10–11].

Pursuant to the LCA, Robins agreed that any failure to abide by its terms—including any future violations of company policy—would subject Robins to potential termination. [DE 82 at 9–10]. Importantly, Popplewell succeeded in removing the standard provision which provided for absenteeism as a cause for discharge. [Popplewell Dep. 34:5–19, DE 72-3 at 26].

*B. Time-off Request*

Following the LCA implementation, on July 8, 2019, Robins informed his supervisor, Walter Wesley, that he needed the following day off to work on home repairs. [DE 82 at 11]. Wesley directed Robins to send a request through the call-off clerk. However, Robins did not do so because he believed it would be denied. *Id.* Instead, he told the clerk the next day that he had to call off due to illness. Robins maintains that he did in fact have an illness, but neither party

disputes that the reason Robins gave to his supervisor differed from the reason provided to the clerk. [DE 81 at 10]. Robins's supervisor requested documentation from a doctor. After Robins could not produce documentation of his illness, his supervisor issued Robins a five-day suspension. [DE 82 at 11–12]. A fact-finding hearing was held to determine whether Robins violated the LCA. Although the LCA did not cover absenteeism as a reason for termination, it did cover providing false information. Following the hearing, Robins's initial suspension for the unexcused absence was converted to a discharge for providing false information. Thus, Robins was terminated for violating the LCA. *Id.* at 13-14.

USW filed three grievances over USS's decision to discharge Robins arguing the termination charge was not timely. [DE 91 at 15]. After USS denied the grievances, the decision to appeal shifted from USW to the parent organization, USW International. Its representative decided to withdraw the grievance rather than go to arbitration. *Id.* at 16. Robins challenged this decision with the NLRB, but it was dismissed as meritless. *Id.* at 16–17.

## *II. Analysis*

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 891 (7th Cir. 2025); *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). A fact is material if it is outcome determinative under applicable law. The burden is upon the moving party to establish that no material fact is in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lewis*, 909 F.3d at 866.

When the movant has met its burden, the opposing party cannot rely solely on the allegations in the pleadings but must "point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011); see also *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("[S]ummary judgment is . . . 'the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'"). The non-moving party cannot rely on conclusory allegations. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir. 1995). Failure to prove an essential element of the alleged activity will render other facts immaterial. *Celotex*, 477 U.S. at 323; *Filippo v. Lee Publications, Inc.*, 485 F. Supp. 2d 969, 972 (N.D. Ind. 2007) (the non-moving party "must do more than raise some metaphysical doubt as to the material facts; she must come forward with specific facts showing a genuine issue for trial")

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *Dave v. Bd. of Trs. of S. Illinois Univ.*, No. 25-1465, 2026 WL 221251, at *1 (7th Cir. Jan. 28, 2026) (citing *Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *McDowell v. Village of Lansing*, 763 F.3d 762, 764–65 (7th Cir. 2014). The court's "favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Lewis*, 909 F.3d at 866 (quoting *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017)). The trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after trial. *Anderson*, 477 U.S. at 248;

*Cung Hnin v. Toa, LLC,* 751 F.3d 499, 504 (7th Cir. 2014); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

Title VII and § 1981 Claims

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "The legal analysis for discrimination claims under Title VII and § 1981 is largely identical." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). These prohibitions also apply to labor unions, making it unlawful to "discriminate against[] any individual because of his race." 42 U.S.C. § 2000e-2(c)(1). Title VII also prohibits "retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis*, 909 F.3d at 866 (citing 42 U.S.C. § 2000e-3(a)). Title VII protects employees who, in good faith, protest discrimination they honestly believe they have suffered. *Scholl v. Educ. Mgmt. Corp.*, No. 2:10-cv-343-TLS, 2012 WL 3915662, at *9 (N.D. Ind. Sept. 7, 2012) (quoting *Mattson v. Caterpillar, Inc.*, 369 F.3d 885, 891 (7th Cir. 2004)).

*A. Discrimination Claims*

In his Response, Robins claimed that USS did not address the issue of the prima facie case. [DE 81 at 4]. However, USS did discuss that issue in detail. [DE 71 at 4–8, 9–11]. The court is entitled to consider that issue as waived by Robins. Because USS has met its burden, the motion will be denied on the merits.

"In this circuit, Title VII plaintiffs may choose to present their evidence under either of two frameworks." *Wilson v. AIM Specialty Health*, No. 23-3418, 2026 WL 1481216, at *3 (7th Cir. 2026 May 27, 2026) (citing *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224

(7th Cir. 2017)). The plaintiff can proceed under either the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework or the *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) framework. The Seventh Circuit simplified its approach to employment discrimination claims in *Ortiz*, which explains that the legal standard when evaluating a motion for a summary judgment on a discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. *Oritz* emphasizes that the "sole question that matters" is "[w]hether a reasonable juror could conclude that [Robins] would have kept his job if he had a different ethnicity, and everything else had remained the same." *Id.* at 764. All relevant evidence "must be considered as a whole." *Id.* at 765.

*Ortiz*'s holding did not affect the *McDonnell Douglas* burden-shifting framework. *Id.* at 766. Under *McDonnell Douglas*, the plaintiff has "the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 352 (7th Cir. 2022)). To establish a prima facie case, "a plaintiff must show that '(1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably.'" *Id.*

Robins, therefore, has two options for surviving summary judgment. He may "prove discrimination in a holistic fashion" relying on all available evidence of racial discrimination. *Wince*, 66 F.4th at 1040. Alternatively, he may use the *McDonnell Douglas* framework, which "remains an efficient way to organize, present, and assess evidence in discrimination cases."

*Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). The controlling

question remains as to whether a reasonable factfinder could conclude that Robins's race caused

his employment termination. *See Napier*, 137 F.4th at 892 ("In short, '[a]lthough there are many

tests and rubrics for viewing discrimination claims ... they are all merely convenient ways to

organize our thoughts' as we decide whether a reasonable factfinder could conclude that a

plaintiff's protected characteristic caused an adverse employment action.") (quoting *Brooks v.

Avancez*, 39 F.4th 424, 433 (7th Cir. 2022)).

   *B. Retaliation Claims*

   The Seventh Circuit "generally use[s] the same standard to review discrimination and

retaliation claims under § 1981 and Title VII." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th

Cir. 2017). To survive summary judgment, a plaintiff can rely on the "direct method" which

requires him to "present evidence satisfying the elements of the retaliation claim: (1) he engaged

in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists

between the activity and the adverse action." *Lewis*, 909 F.3d at 866; *Napier*, 137 F.4th at 896. A

plaintiff may also choose to invoke the *McDonnell Douglas* burden-shifting framework in the

retaliation context.

   In *Lewis*, the Seventh Circuit clarified that following *Ortiz*, "[t]he *McDonnell Douglas*

framework is just "a formal way of analyzing a discrimination case when a certain kind of

circumstantial evidence—evidence that similarly situated employees not in the plaintiff's

protected class were treated better—would permit a jury to infer discriminatory intent." *Lewis*,

909 F.3d at 871 (quoting *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499–500

(7th Cir. 2017)). The court must still "analyze the evidence as a whole to determine 'whether the

evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity]

caused the . . . adverse employment action.'" *Lewis*, 909 F.3d at 871 (quoting *Ortiz*, 834 F.3d at 765) (alteration in original).

Robins has invoked both *McDonnell Douglas* and *Ortiz* language at various points in his responses. Where Robins has "presented [his] argument in [*McDonnell Douglas*] terms, we will begin our assessment of the evidence by employing that construct." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). The court will then assess all the evidence to determine whether a reasonable factfinder could conclude that Robins's race or protected activity caused an adverse employment action.

Counts I–III: Robins's Discrimination and Retaliation Claims Against USW

Robins experienced two adverse employment actions based on allegations of making false statements: the parking lot incident and the sick day. The first one had led to the LCA and the second one led to his discharge. He has not specified whether either or both forms the basis of his retaliation claims.

Robins has proceeded exclusively under *Ortiz* in his discrimination and retaliation claims against USW. The relevant question therefore "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [or protected activity]" caused an adverse action by the union in its representation of him. *Ortiz*, 834 F.3d at 765; *Lewis*, 909 F.3d at 871. To survive summary judgment, Robins must "present evidence from which it could be inferred that the union refused to arbitrate his grievance *because of* his race." *Motley v. IAMAW Dist. Lodge 141*, 768 F. App'x 570, 573 (7th Cir. 2019) (emphasis in original). If a reasonable factfinder could conclude that USW would have represented Robins differently "had he been white—or had he refrained from complaining about other discriminatory episodes—then the

union violated Title VII." *Green v. Am. Fed'n of Tchrs./Illinois Fed'n of Tchrs. Loc. 604*, 740 F.3d 1104, 1107 (7th Cir. 2014).

The Seventh Circuit explained a union's duty with regards to racial discrimination in *E.E.O.C. v. Pipefitters Ass'n Loc. Union 597*, when it rejected the "contention that unions have an affirmative duty to prevent racial harassment or other forms of unlawful discrimination in the workplace." 334 F.3d 656, 661 (7th Cir. 2003). A union will be held liable, however, if it was "vigilant to detect and correct mistreatment of white workers but has a policy of ignoring the interests of black ones." *Id.* For example, if a union refuses when "a black worker asks the union to grieve a complaint . . . though if the worker were white the union would grieve his complaint." *Id.* In *Buford v. Laborers' Int'l Union Loc. 269*, the plaintiff sued his union for discrimination after he was fired from his construction job after just two weeks. 787 F. App'x 341 (7th Cir. 2019). The company fired him based on "'threatening behavior' in clashes with coworkers," but during one such quarrel the plaintiff was called a racial slur. *Id.* at 343. The plaintiff claimed that "his discharge was discriminatory because the racial slur from his union-member coworker shows that the union's decision to acquiesce in his firing was racially motivated." *Id.* at 344. The court affirmed summary judgment, noting that "no evidence suggests that . . . union leaders knew about, let alone condoned, the slur. So, a factfinder could not reasonably attribute the slur to either the company or the union." *Id.*

*A. Discrimination by USW*

Robins has not pointed to any evidence in the record that would allow a reasonable factfinder to conclude that USW discriminated against him on the basis of race. Instead, Robins relies on the incidents and history of racial tension that existed between Robins and his coworkers. [DE 90 at 6–7]. The undisputed record, however, shows that USW filed a grievance

when Robins was first transferred, [DE 91 at 4], negotiated on Robins's behalf to get him transferred back to the Pickle Department, *id.* at 5, investigated disputes between Robins and his coworkers, *id.* at 7–8, and worked to ensure Robins was given the LCA rather than terminated, *id.* at 9–10. Similar to *Buford*, there is no evidence of discrimination that can be reasonably attributed to the union. While USW was aware of the issues between Robins and his coworkers, the record clearly shows the union took steps in response to these complaints. [DE 91 at 8]. USW is not responsible for the "covert racism" of the co-workers, if any actually existed.

Regarding the LCA, Robins admits that Popplewell informed him that he could contest the discharge, but that it would take several months, he would not be paid, and his lack of seniority was noteworthy. Robins "has not directed us to any evidence that suggests the union did not honestly believe the stated reasons for its decision." *Motley*, 768 F. App'x at 573. Similarly, Robins has not pointed to any evidence that USW's decisions during his discharge grievance proceedings were made "*because of* his race" or any reasons to doubt the reasons for withdrawing the grievances. *Id.* There is nothing that suggests USW would have handled the representation differently had Robins been white. *Green*, 740 F.3d at 1107. Robins has "cited no evidence that the union . . . treated non-black members who were accused of [providing false information] better than it treated him." *Buford*, 787 F. App'x at 344.

The legal question is not whether USW's choices were the most effective options in representing Robins. It is Robins's burden to show evidence that could lead to a finding of racial motivation for the decisions USW took. Because a reasonable factfinder could not infer that Robins's race played a factor in USW's actions, Robins has failed to meet his burden under *Ortiz*.

*B. Retaliation by USW*

Turning to Robins's claim of retaliation by USW, Robins must show that "(1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action." *Lewis*, 909 F.3d at 866. To show causation, Robins must establish a "but-for causal link between the protected activity and the adverse action." *Napier*, 137 F.4th at 896. If USW would have represented Robins differently "had he refrained from complaining about other discriminatory episodes—then the union violated Title VII." *Green*, 740 F.3d at 1107.

Again, Robins has pointed to nothing that indicates USW acted with retaliatory intent. Robins asserts that there is "ample evidence" of a causal link but does not even specify what the alleged protected activity was or what adverse action USW took. Instead, Robins points to allegations of race discrimination by USS, a text that Robins sent to Popplewell, and Popplewell meeting with Robins's coworkers. From there, Robins makes the conclusory assertion that these actions were behind USW's decision to forego a grievance, go forward with the LCA (which Robins agreed to), and "its handling of his termination." [DE 90 at 11]. But these "mere conclusory allegations do not constitute evidence." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). This is not enough for Robins to meet his burden: "[a]ssertions at such a high level of generality do not suffice at this stage, though—a party 'must present *specific facts* showing a genuine issue to survive summary judgment.'" *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017) (quoting *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722–23 (7th Cir. 2008)). There is no way for a reasonable factfinder to "conclude that the plaintiff's [protected activity] caused the . . . adverse employment action." *Lewis*, 909 F.3d at 871 (quoting *Ortiz*, 834 F.3d at 765).

14

Accordingly, USW's Motion for Summary Judgment as to Count I, Count II, and Count III is **GRANTED**.

Counts IV & VI: Robins's Racial Discrimination Claims Against USS

Robins used both the *McDonnell Douglas* and *Ortiz* framework in his racial discrimination claims against USS. As previously stated, Robins waived any challenge to his prima facie case by not addressing it in his response. However, the court will address each approach in turn. *See David*, 846 F.3d at 224.

*A. The McDonnell Douglas Approach*

With respect to the April suspension, Robins attempts to employ the *McDonnell Douglas* approach. As discussed above, this requires Robins to show that (1) he is in a protected class; (2) was meeting his employer's job expectations; (3) suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *See Wince*, 66 F.4th at 1040. Establishing this prima facie case would then trigger the burden-shifting framework, shifting "to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Id.* (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)). In their respective motions, however, the parties dispute in which phase of the burden-shifting framework they are operating. Robins sets forth evidence of pretext, operating in the final phase of *McDonnell Douglas*. Robins, however, has not satisfied the fourth element for the *McDonnell Douglas* prima facie case, which requires showing that a similarly situated employee outside of the protected class was treated more favorably. There is no indication that USS treated an employee outside of the protected class more favorably after believing he provided false information. Though similarly situated employees "need not be identical in every conceivable way," they "must be 'directly comparable'

15

to the plaintiff 'in all material respects.'" *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th

Cir. 2022) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). In *Reives*, the

plaintiff alleged he had been disciplined more harshly because of his race, despite doing "exactly

the same thing" as his white co-worker. *Id.* The court explained the two were not similarly

situated because they "engaged in different misconduct and were punished for violating different

rules." *Id.* While Robins's complaints against Christmas certainly allege reproachable conduct,

the record is devoid of any claim that Downs ever believed Christmas gave conflicting reports to

USS. In contrast, both sides agree that the two reports from Robins contained conflicting

information about what happened on April 1, 2019, merely disagreeing on whether that was the

fault of Robins or the security guard.

Robins offers nothing but conclusory statements that white co-workers were treated better

than he was. Robins asserts that Christmas, a white employee, was not placed on an LCA

following the April 1st altercation and was, therefore, treated more favorably. This argument is a

mischaracterization of the facts apparent in the record. Robins was placed on an LCA because

Downs found Robins's reports to be materially inconsistent and questionable in sincerity. Robins

was not placed on the LCA due to the altercation itself. Downs had the responsibility of

determining who was more credible, and he chose Christmas. Nothing suggests that his decision

was racially motivated.

Because Robins treated the *McDonnel Douglas* prima facie burden as already met, his

argument primarily seeks to present evidence of pretext to rebut USS's proffered

nondiscriminatory reason for placing Robins on the LCA. These arguments fail under *McDonnell

Douglas* because the initial burden never in fact shifted. Consequently, this analysis is better

suited for consideration under *Ortiz*. To give fair treatment to Robins's arguments, the court will

evaluate them as part of the *Ortiz* framework to consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge."

### B. Holistic Ortiz Approach

While Robins has not shifted the burden under *McDonnell Douglas*, his claim can still withstand summary judgment if the evidence, considered as a whole, permits a reasonable factfinder to conclude that Robins's race caused his termination. Robins alleges several incidents show that racial animus occurred towards him while working at USS. Specifically, Robins points to his initial transfer out of the Pickle Department, the podcast incident with Christmas, and, of course, the parking lot incident with Christmas.

Robins argues that his transfer out of the Pickle Department, when a white co-worker, Chris Wilkey, had less seniority than him, indicates that he was being treated differently based on his race. He also has detailed several incidents, including one with Christmas allegedly playing a podcast about black-on-black crime. These claims were not asserted in Robins's EEOC Charge or his Amended Complaint, and Robins does not assert new factual or legal theories. Robins is still proceeding only on his well-pled theories relating to discipline following the April 1st incident.

That said, the court will consider the alleged incidents as evidence for pretext. Without more, these incidents do not support any reasonable inference that Downs, the decisionmaker, took adverse actions against Robins because of his race. Rather, following Robins's complaints, Downs met with Robins's coworkers and instructed them to "figure out how to work together." [DE 81 at 6]. An isolated incident like Christmas playing the podcast "fails to establish that [USS] had any racial animus against [Robins]." *Sandoval v. Franciscan All., Inc.*, No. 2:22-cv-218, 2024 WL 340765, at *7 (N.D. Ind. Jan. 29, 2024).

17

Seventh Circuit precedent requires some indication in the record that links Downs to the racial animus. In *Ortiz*, the court reversed summary judgment when there was a genuine dispute of fact as to whether the plaintiff's managers had "subjected him to a barrage of ethnic slurs." *Ortiz*, 834 F.3d at 763; s*ee also Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958–59 (7th Cir. 2021) (affirming summary judgment where the plaintiff "recite[d] a litany of past wrongs" but did not show any discriminatory reasons from his supervisor).

Robins points to the LCA as an example of unfair treatment on the basis of race. USS maintains that the LCA was implemented because of inconsistencies between the guard's report and the Ethics Hotline. Robins does not dispute that Downs found his statements were inconsistent and lacked merit. [DE 72-1, p. 226]. The primary difference between the reports is a dispute over whether Robins claimed that Christmas said "F*** your black a**" or "F** you" and "I'll kick your black a**." This could arguably permit a factfinder to infer that this was pretext to suspend Robins. *See McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 810 (7th Cir. 2017). But even if the inconsistencies were "a convenient excuse for something [Downs] wanted to do regardless, . . . pretext alone is not enough; [Robins] must also show that the explanations are a pretext *for the prohibited animus*." *Napier*, 137 F.4th at 893 (emphasis added) (quoting *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 740 (7th Cir. 2013)). Simply put, the record lacks anything that allows for such an inference of racial discrimination on the part of Downs.

The same is true for Robins's July termination. Robins does not deny that he gave two differing reasons for why he needed to call out on July 9th. [DE 82 at 11]. Robins asserts, however, that the "ample evidence of racial animus" towards him at USS along with questionable timing of USS's discipline is sufficient circumstantial evidence to survive summary

18

judgment. [DE 81 at 7–9]. But as the court has discussed, none of Robins's contentions of racial animus allows any inference that Downs acted based on race. Robins similarly provides no evidence that his supervisor, Wesley, acted with racial animus. Robins is free to rely on circumstantial evidence to support his claim, but it must be "circumstantial evidence of intentional racial discrimination." *Wince*, 66 F.4th at 1042 (quoting *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016)); *see also Bagwe*. 811 F.3d at 880 (citation omitted) ("The circumstantial evidence, taken together, 'must point directly to a discriminatory reason for the employer's action.'"). Robins testified that white employees had gotten approval from Wesley for time off. He worried his request would be denied, so he did not call the call-off clerk. [DE 82-2]. Robins then stated he became sick later that evening and called the call-off clerk the next morning to report off. *Id.* Merely believing he would have been treated differently because of his race is not circumstantial evidence.

Robins has laid out a series of employment actions against him that he feels were motivated by race. But at the summary judgment stage, Robins's must "point[] to any evidence linking these episodes to racial animus." *Wince*, 66 F.4th at 1042. Because Robins has not done so, he has failed to meet the *Ortiz* standard.

Accordingly, USS's Motion for Summary Judgment as to Count IV and Count VI is **GRANTED**.

Counts V & VI: Robins's Retaliation Claim Against USS

Robins's vaguely asserted claim for retaliation against USS raises similar questions. Robins has not invoked the *McDonnell Douglas* framework or pointed to any similarly situated employees for this claim. Instead, Robins relies on the direct method here, which requires him to

19

show (1) a protected activity, (2) an adverse action, and (3) a causal connection between the two. *Lewis*, 909 F.3d at 866; *Napier*, 137 F.4th at 896.

USS has not disputed that Robins engaged in protected activity when he made the reports detailing Christmas's alleged statements in the parking lot. It is also undisputed that the suspension and imposition of the LCA is an adverse employment action. The Supreme Court has emphasized that Title VII's retaliation provision "cover[s] a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011). "For a retaliation claim, a materially adverse action is defined as an action 'that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911–12 (7th Cir. 2022) (quoting *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016)). Therefore, surviving summary judgment depends on whether Robins can show causation.

### Causation in Retaliation Claims

Robins must point to evidence that would permit a reasonable fact finder to conclude that retaliatory motive caused the LCA. To meet this burden, Robins must establish a "but-for causal link between the protected activity and the adverse action." *Napier*, 137 F.4th at 896. This requires proof that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Lesiv v*, 39 F.4th at 915 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

For a retaliation claim, "causation can be established by circumstantial evidence, which includes, for example, 'suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently' . . . [and] any 'other evidence from which an inference of discriminatory intent might be drawn.'" *Abrego v. Wilkie*, 907 F.3d

20

1004 (7th Cir. 2018) (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019, 1021 (7th Cir. 2016)). As explained above, the *McDonnell Douglas* framework is useful when one type of circumstantial evidence—similarly situated employees—is used to show the casual link. *Lewis*, 909 F.3d at 871. However, Robins does not rely on similarly situated employees and "*McDonnell Douglas* is not the only way to assess circumstantial evidence." *David*, 846 F.3d at 224.

In *Abrego v. Wilkie*, the plaintiff brought a retaliation claim alleging he had had been removed from his position as a dental assistant in retaliation for filing complaints of race and sex-based discrimination. *Abrego*, 907 F.3d 1004. Abrego's claim was based on the "close temporal proximity between his third EEOC complaint—filed on October 3, 2014—and the VA's issuance of a letter notifying him of his removal, which was sent on November 19, 2014." *Id.* at 1015. The court affirmed summary judgment, explaining that temporal proximity alone would rarely be enough to show causation. *Id*. Abrego failed to point to any evidence besides the timing that would "allow a reasonable jury to conclude that but-for his filing of the EEOC complaints, he would not have been suspended or removed." *Id.* Additionally, the court emphasized the legitimate reasons the defendant had for firing the plaintiff, unrelated to the protected conduct, including "conflict with patients, coworkers, and supervisors, and the failure to complete assigned tasks." *Id.* In other contexts, courts have found there was not sufficient evidence of causation when the plaintiff's supervisors were not aware of the plaintiff's protected activity, *see Lesiv*, 39 F.4th at 915–16; *Indiana Wesleyan Univ.*, 36 F.4th 755, 762 (7th Cir. 2022), or when the protected activity occurred after the adverse action, *see id.* at 761–62.

Robins's case presents a different scenario. Robins's causation does not need to rely merely on temporal proximity. Here, the adverse action was directly linked to the protected conduct. Unlike *Abrego*, this is not a case where Robins was placed on the LCA for work-related

issues, such as his continuing conflict with his co-workers, and now is seeking to rely on the temporal proximity to his protected conduct to claim retaliation. Instead, it was the subject of Robins's protected conduct, the two reports themselves, that directly triggered the adverse employment action. If Robins never had made the reports, then the discrepancies would not exist (regardless of whether they were the fault of Robins or the transcribers) and the adverse employment action never would have occurred. The parties do not dispute that the LCA was an adverse employment action.

USS asserts that it was the discrepancies in the reports that led to LCA placement rather than making the reports. The Seventh Circuit explained that if a plaintiff makes the prima facie case outside of the *McDonnell Douglas* framework, that "should be enough to entitle the plaintiff to a jury trial unless the defendant can produce uncontradicted evidence that he would have fired the plaintiff anyway." *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 642–43 (7th Cir. 2002). When a causal link is shown, "[t]he fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: what was the true cause of the discharge?" *Id.* The court later clarified, however, that while "we often discuss the employer's proffer of a nonretaliatory explanation and the corresponding pretext inquiry in terms of the *McDonnell Douglas* burden-shifting framework embodied by the indirect method," the failure to "cast doubt on an employer's nonretaliatory explanation will also doom a retaliation claim under the direct method." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 n.6 (7th Cir. 2008). Therefore, while USS's nonretaliatory explanation does not trigger a formal burden shifting, it is relevant to the ultimate question under *Ortiz*, of whether a reasonable factfinder could conclude there was retaliatory motive. *Lesiv*, 39 F.4th at 911.

USS emphasizes that Downs reached a good faith conclusion that Robins had provided false information between the reports. In *Napier*, the plaintiff brought a Title VII discrimination claim alleging that he had been fired from the school defendant on the basis of sex. *Napier*, 137 F.4th at 887. The plaintiff then was rejected for a job posting at the school, so he added a retaliation claim, alleging that the decision not to rehire him was retaliation for the discrimination lawsuit. *Id.* at 890. The court affirmed summary judgment on both claims, explaining in the retaliation analysis that the "record evidence indicates that [the decisionmaker] sincerely believed that Orchard terminated Napier for cause and would have had little reason to rehire him less than a year later." *Id.* at 896. Based on this sincere belief, the court concluded that "[n]o reasonable fact-finder could determine that Napier's litigation, rather than the events that led to his termination, was the 'but-for' cause of Orchard's decision not to rehire him." *Id.*

Similarly, in *Lohmeier v. Gottlieb Mem'l Hosp.*, the plaintiff brought both discrimination and retaliation claims after being terminated by the hospital defendant for suspected theft of controlled opioids. 147 F.4th 817 (7th Cir. 2025). Lohmeier's retaliation claim alleged that when she appealed her termination, claiming it was based on race, the hospital retaliated against her by depriving her of a meaningful appeal process. *Id.* at 829. But as the court noted, the company's appeal panel allowed both sides to present their cases and reviewed the investigation's documents, witness statements, and security logs. *Id.* at 825. The company's panel "upheld her termination, explaining that Lohmeier had not presented a plausible reason for her observed decline in behavior and that security access logs showed Lohmeier had twice entered the equipment room for no documented reason." *Id.* The court affirmed summary judgment because Lohmeier "provide[d] no evidence of how the employee grievance process deviated from the established procedures" and thus the plaintiff "[did] not meet her burden to show that the

23

grievance procedure . . . would have been different had she not appealed her termination." *Id.* at 829.

USS's good faith conclusion, however, is distinguishable. The retaliation claim in *Napier* turned on whether the company's decision not to rehire the plaintiff was retaliation for his ongoing discrimination claim. The court accepted the decisionmaker's good faith belief in unrelated, legitimate reasons not to hire the plaintiff due to "past poor performance" and a "fractured relationship" for which he had been fired less than a year prior. *Napier*, 137 F.4th at 896. Similarly, in *Lohmeier*, the claim depended on whether the company's appeal panel retaliated against the plaintiff by not providing a meaningful appeal process. The court pointed to the lack of evidence that the process "deviated from the established procedures" when the panel investigated the legitimate reasons for terminating the plaintiff, including her "observed decline in behavior" and unexplained visits to the equipment room. *Lohmeier*, 147 F.4th at 825.

Conversely, the good faith belief is at issue here. Whether Robins provided false information in the reports is directly related to the protected conduct. USS's good faith conclusion is not similar to the decisionmaker's belief of the plaintiff's past work issue in *Napier* or the appeal panel's review of the plaintiff's behavior in *Lohmeier*. Instead, USS asks the court to accept a good faith belief for terminating Robins that is itself predicated on an aspect of the protected activity. However, Robins has not pointed to any evidence in the record that shows that Downs harbored an intent to retaliate against him. There is no dispute that Downs was presented with two different accounts of the incident. Robins's challenge to how the differing accounts occurred does not create a *bona fide* factual dispute.

In order to defeat summary judgment, Robins "must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered

by the employer were not its true reasons but were a pretext for discrimination." *Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2026) (quoting *Robertson v. Dep't of Health Services*, 949 F.3d 371, 378 (7th Cir. 2020)). While Robins submits that his transfer and the black-on-black podcast constitute pretext, he has not shown that Downs knew anything about either incident. Additionally, conduct of others cannot be attributed to Downs. Robins has presented no evidence to dispute Downs's good faith belief that Robins made two different reports.

When evaluating an employer's proffered justification for the adverse employment action, the court will not evaluate whether the justification "was accurate or even whether it was unfair." *Gnutek*, 80 F.4th at 824. The court must determine if the stated justification "can be characterized as a falsehood rather than an honestly held belief." *Id.* Robins has not directed the court to any evidence that Downs, the relevant decisionmaker, did not honestly believe Robins submitted false reports.

Additionally, Robins has not presented any evidence that his termination was based on discriminatory pretext. Robins was terminated after he called off work sick the same day he had explored requesting time off for personal reasons. Downs, again, was presented with conflicting evidence and chose not to believe Robins actually was sick that day. Robins claims that the timing of his termination demonstrates pretext. This argument is unavailing because undisputed evidence shows that USS has issued other disciplines beyond the initial 24-hour period after discovery while investigating underlying actions. [DE 72-2].

No issue of fact exists as to whether the purported reasoning for Robins's LCA and termination was sincerely held. Robins has failed to direct the court to any evidence that Downs, the decisionmaker, harbored retaliatory intent against him.

25

III. Conclusion

Accordingly, USW's Motion for Summary Judgment [DE 74] is **GRANTED** as to

Counts I, II, and III. USS's Motion for Summary Judgment [DE 70] is **GRANTED** as to Count

IV, Count V, and Count VI. This case is now closed.


ENTERED this 5th day of June, 2026.

/s/ Andrew P. Rodovich
United States Magistrate Judge